# CIRCUIT COURT FOR HAMILTON COUNTY
### State of Tennessee

FILED IN OFFICE
2017 FEB 24 AM 9: 33
LARRY L. HENRY, CLERK
BY _____ DC

CARL LEWIS, in his individual
capacity and as father and next friend
of KARRIE'UN McGUIRE, a minor,

§
§
§
§

       *Plaintiffs,*

§
§
§

No 17C291

~v~

§
§

HAMILTON COUNTY DEPARTMENT
OF EDUCATION,

§
§

JURY DEMAND   I

DURHAM SCHOOL SERVICES, L.P.,

§
§
§

NATIONAL EXPRESS, LLC,

§
§
§

JOHNTHONY WALKER,
Individually and in his capacity
as an agent for the Hamilton County
Department of Education, Durham School
Services, L.P., and National Express, LLC,

§
§
§
§
§
§

BENJAMIN COULTER,
Individually and in his capacity
as an agent for the Hamilton County
Department of Education,

§
§
§
§
§
§

       *Defendants.*

§

## COMPLAINT

PLAINTIFFS, for their causes of action, will show the Court:

**Introduction:**

    1.     This is an action for money damages brought pursuant to 42 U.S.C. §§ 1981,

1983, 1985, and 1988 to redress the deprivation of rights secured to Plaintiffs by the Fourteenth

Amendment to the United States Constitution and for violations of the common laws of the State

of Tennessee by the Defendants.

~ 1 ~

**EXHIBIT**
**A**

2.     Plaintiffs aver that the individually named defendant, Johnthony Walker ("Walker"), acted as an agent for the Hamilton County Department of Education ("HCDE"), Durham School Services, L.P. ("Durham"), and National Express, LLC ("National"), and was at all times relevant to this matter acting under color of law and under color of his office with the HCDE and with Durham and National.

4.     Plaintiffs aver that the individually named defendant, Benjamin Coulter ("Coulter"), acted as an agent for HCDE and was at all times relevant to this matter acting under color of law and under color of his office with HCDE.

5.     Plaintiffs maintain that Walker and Coulter committed these violations, further set forth herein, as a result of policies, customs, practices, and/or procedures of HCDE.

6.     Plaintiffs maintain the Durham and National were performing exclusive state functions in concert with HCDE and were at all times relevant to this matter acting under color of law.

7.     Plaintiffs aver that the acts and omissions of the Defendants subjected Plaintiffs to mental anguish/emotional distress, and as to the minor child, severe physical injuries.

8.     At all times during the events herein described the Defendants were engaged in a joint venture and assisted each other in performing the various acts described herein.

**Jurisdiction and Venue:**

9.     This is an action to redress the Defendants' deprivation of rights secured to Plaintiffs by the Fourteenth Amendments of the United States Constitution, rights secured to the Plaintiffs under 42 U.S.C. §§ 1981, 1983, 1985, and for damages under 42 U.S.C. § 1988. This Court has concurrent jurisdiction with the federal courts to enforce the rights created by federal law as set forth in the authority stated in Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 507-

08 (1962); Watson v. Cleveland Chair Co., 789 S.W.2d 538, 542 (Tenn. 1989); and Poling v. Goins, 713 S.W.2d 305, 307 (Tenn. 1986).

10.     This is an action to redress the Defendants' deprivation of rights secured to Plaintiffs under Tennessee state law. This Court is vested with original jurisdiction over Plaintiffs' state claims pursuant to TENN. CODE ANN. § 16-10-101, et seq.

11.     Venue is proper in this Court pursuant to TENN. CODE ANN. § 20-4-102, for the unlawful actions and omissions described and alleged herein occurred within Hamilton County.

**The Parties – Lewis and Child:**

12.     Plaintiffs are African-American citizens of the United States and residents and citizens of the State of Tennessee.

13.     Plaintiff Carl Lewis (herein after when reference individually, "Lewis") is the biological father and joint care-giver of the minor child in this matter, Plaintiff Karrie'un McGuire ("child"). Lewis brings this action on behalf of the child as father and next friend.

14.     At all times relevant to this matter, Lewis held the child as his own, resided with the child and child's mother Shanquatta Byrd ("Byrd") and the child's other siblings since the child was one year old.

15.     Lewis and Byrd are the natural parents of the child's siblings.

16.     At all times relevant to this matter, the child was enrolled as a student at a public school operated and maintained by HCDE known as Woodmore Elementary ("Woodmore"), and was in the sole care of the Defendants during all hours of school operation and during all time as a passenger in what will be further described as Bus 366.

~ 3 ~

17.     Shortly after the events described herein, and the incident that lead to this action having happened on November 21, 2016 ("Bus Crash"), Byrd engaged the local law firm of Warren & Griffin to bring an action similar to the one averred herein.

18.     Following the Bus Crash, Lewis and Byrd were at Erlanger Hospital with the child on a daily basis.

19.     On or about November 23, 2016, law enforcement arrested Lewis on federal charges unrelated to the events at issue in this Complaint.

20.     Within 30 days of the Bus Crash and about 5 to 6 days after his arrest, Lewis was in custody at the Hamilton County Jail ("jail") when a man approached Lewis in the jail, and attempted to "sign up" Lewis for representation by a law firm located in Georgia.

21.     This man identified himself to Lewis by the name of "Coffman" or "Kaufman" and represented to Lewis that he was an "investigator" for a black female attorney in Savannah, Georgia.

22.     Lewis described "Coffman" as a black male, tall and slim build and about 50-55 years of age.

23.     Jail records reveal a person by the name of Paul Coffman visited Lewis at the jail during the times averred in the previous paragraphs.

24.     Coffman told Lewis that Lewis was "entitled to money too" since he was the father of the child.

25.     Coffman further told Lewis that if Lewis "signed up" with the attorney Coffman represented that the attorney would help Lewis "get out of jail," and would "get [Lewis] an attorney for [his] federal case."

~ 4 ~

26.     In the related criminal prosecution of Walker, C. Mark Warren of the Warren & Griffin law firm appeared in the Hamilton County Court of General Sessions and monitored the criminal proceedings against Walker.

27.     Shortly thereafter, Byrd told Lewis that she changed from Warren & Griffin to the firm represented by "Coffman" in part, because that firm was a "black firm."

28.     On December 6, 2016, the Georgia law firm of Fried, Rogers, Goldberg LLC ("Georgia Firm") filed an action in the Hamilton County Circuit Court against Walker, Durham, and National on behalf of Byrd and the child.

29.     The Georgia Firm did not include Lewis as a party in any manner.

30.     The claims filed by the Georgia Firm were only Tennessee state tort claims.

31.     Since December 6, 2016, Byrd has told Lewis that the "attorneys" were paying for her car maintenance and for motel rooms in Atlanta, Georgia so she and the siblings could be with the child as the child was undergoing treatment at "Emory."

32.     Lewis has paramount standing to bring this action for himself and for the child based upon his exclusion by Byrd in the action brought by the Georgia Firm and the exclusion of the federal claims in the action brought by Byrd, and the probability that the actions described in the previous paragraphs suggest that Coffman and the Georgia Firm may not be acting in the best interests of the child.

**The Parties – HCDE:**

33.     At all times relevant to this cause of action, HCDE is a political sub-division of the State of Tennessee and a governmental entity separate and apart from Hamilton County Government and a governmental entity as defined under TENN. CODE ANN. § 29-20-102(3).

~ 5 ~

34. At all times relevant to this cause of action, HCDE had a duty to provide education to Hamilton County students and to provide service not limited to transportation of students to and from the public schools operated by HCDE.

35. HCDE may be served with a copy of the summons and complaint through Dr. Kirk Kelly, 3074 Hickory Valley Road, Chattanooga, Tennessee 37421.

**The Parties- Durham:**

36. Durham is a Delaware Limited Partnership operating its primary place of business at 1431 Opus Place, Suite 200, Downers Grove, Illinois 60515.

37. Durham conducts regular business in the State of Tennessee by operating a full-service transportation company engaged in the transportation of children/students to and from the public schools operated by HCDE, including Woodmore.

38. Durham may be served with a copy of the summons and complaint through CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929.

**The Parties- National:**

39. National is a Limited Partnership operating its primary place of business at 4300 Weaver Parkway, Warrenville, Illinois.

40. National is the North American subsidiary of National Express Group, PLC, a transportation firm in the United Kingdom. National is made up of multiple transportation businesses including, but not limited to Durham.

41. National conducts regular business in the State of Tennessee through its subsidiary, Durham, by operating a full-service transportation company engaged in the transportation of children/students to and from the public schools operated by HCDE, including Woodmore.

~ 6 ~

42.     National may be served with a copy of the summons and complaint through CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

**The Parties – Coulter:**

43.     At all times relevant to this cause of action, Coulter was employed by HCDE as Supervisor of Transportation for HCDE and in his capacity directed all aspects of student transportation for HCDE, and acted in his official capacity as agent, servant, and employee, as defined under TENN. CODE ANN. § 29-20-102(2), for HCDE.

44.     Plaintiffs sue Coulter in his individual and official capacities.

45.     Coulter may be served with a copy of the summons and complaint at 3074 Hickory Valley Road, Chattanooga, Tennessee 37421.

**The Parties – Walker:**

46.     At all times relevant to this cause of action, Walker was employed by Durham and National as a bus driver and operated the school bus at issue on behalf of HCDE, Durham, and National.

47.     Plaintiffs sue Walker in his individual and official capacities.

48.     Walker may be served with a copy of the summons and complaint at the Hamilton County Jail.

**Factual Basis of Complaint:**

49.     At all times relevant to this cause of action, HCDE exercised authority and control over Woodmore and its staff.

50.     HCDE, Durham, and National (hereinafter, Durham and National are designated as "Durham") exercised exclusive and joint control over the school bus transportation of students, including the child, to and from Woodmore.

~ 7 ~

51. All Hamilton County public school children who ride school buses are transported by a single contractor, Durham.

52. Durham was at all times relevant to this cause of action a Common Carrier and therefore charged with the highest degree of care consistent with the conduct of its business, which in this case was the transportation of young schoolchildren to and from school.

53. On July 1, 2013, HCDE entered into a four-year service contract with Durham to provide school bus services to the children of Chattanooga, Tennessee, including students attending Woodmore. That contract is attached to this Complaint as Exhibit A.

54. The terms of the contract require Durham to hold harmless and indemnify HCDE, its officers, agents and employees from, "every claim or demand which may be made by reason of injury to person...sustained by any person...cause by, in whole or in part, or arising out of or related to any negligent act or omission, willful misconduct...of [Durham] or of any person...directly or indirectly employed by [Durham] in connection with its performance under the Agreement and irrespective of any allegation of fault against Hamilton County Board of Education, Hamilton County Department of Education and/or its Officers, Agents and Employees."

55. The contract also requires that Durham, "shall endeavor to secure a dismissal of any such proceeding against Hamilton County Board of Education, Hamilton County Department of Education and/or its Officers, Agents and Employees promptly upon receipt of any such claim or demand and shall substitute [Durham] as a party defendant."

56. Further, the contract requires Durham to defend HCDE, and/or its Officers, Agents and Employees, for any claim brought against them in connection with the performance of the agreement and to satisfy any judgment that may be rendered against them.

~ 8 ~

57.     The agreement establishes that Durham is required to defend the instant claims against HCDE and its officers, employees and agents, is required to satisfy any judgment against them from the instant claims, and is required to stand in their shoes in this matter.

58.     The contract provides that Durham and HCDE will:

> a. Work together to establish school bus routes;
>
> b. Work together to plan school bus scheduling; and
>
> c. Work together to plan school bus assignments.

59.     The contract required Durham to purchase and equip its school buses with digital cameras and radios and established that were any person to alter or destroy the radios or digital recordings, the private property of Durham, that person would be subject to prosecution. Upon information and belief, there is no Tennessee criminal statute which prohibits alteration or tampering with radio or digital video recording of a private person. Accordingly, Durham's private property was afforded the protection of governmental property because Durham was both a partner with HCDE in this joint undertaking and a state actor.

60.     The contract also required Durham to purchase and equip the Chattanooga school buses with GPS technology that "…enables staff to monitor the path and speed of a bus." Durham and the District further agreed that "[HCDE] staff will be given access to this system."

61.     Monitoring the path of the school bus would reveal when a bus is no longer traveling on the designated bus route, exceeding the speed limit, and driving in a reckless manner. Pursuant to the contract, both Durham and HCDE were responsible for monitoring the path and speed of the buses, including Bus 366.

62.     The contract further provides that, "[r]ules and regulations for details incidental to the operation of bus routes, bus stops and other attendant matters shall be mutually agreed upon [by HCDE and Durham]."

63.     As an equal partner in this joint venture, Durham worked closely with HCDE on a day-to-day basis. Durham had the power to veto or approve any existing or proposed rule or regulation which involved the provision of school bus services in Chattanooga, a power equal to that held by HCDE. Establishing, repealing and altering regulations and rules governing the provision of governmental services is a power traditionally reserved exclusively to the state.

64.     The contract requires Durham to designate one person as its local representative to act as the supervisor for the operations for HCDE. This person shall be available during all regular working hours of school days for the purpose of handling routing, assignments, and operational concerns. The supervisor shall have the authority to act in all matters covered by the policies mutually agreed to by Durham and HCDE and therefore is an agent of both Durham and HCDE.

65.     Durham, HCDE, Coulter, and Walker jointly participated in the un-constitutional wrongdoing alleged herein by conspiracy, agreement and concerted action. Each shared a common goal to violate these Plaintiffs' Constitutional rights. The conduct these Defendants engaged in pursuant to this conspiracy, agreement and concerted action did in fact violate the Plaintiffs' Constitutional rights.

66.     In order to effectuate the contract's requirements, the balance of its terms make clear that Durham and HCDE were pervasively entwined in the state action complained of herein.

67.      Durham and Walker carried out functions historically and traditionally reserved exclusively to governmental entities.

68.      The acts complained of herein were committed by Durham and HCDE under color of state law and were state actions. Durham, at all times relevant to this Complaint, was a state actor.

69.      Pursuant to the terms of the contract, Durham was subject to the coercive power of HCDE and received such significant overt and covert encouragement from HCDE that the decisions of Durham were those of HCDE.

70.      The regulations and rules which HCDE and Durham jointly promulgated include, but are not limited to the Hamilton County Board of Education Bus Rules, and the Transportation Policy of the Hamilton County Board of Education. These rules and regulations provide, in relevant part, as follows:

    a.      The driver has the authority to assign a student a seat at any time.[1]

    b.      The bus driver is authorized and empowered to, "maintain discipline of students."

    c.      The bus driver is to immediately notify his or her supervisor when a student is injured on the bus.

    d.      School principals are responsible for putting students on and removing students from the bus each day while on their campus.

    e.      Bus drivers shall create a written bus-seating chart on routes where there are frequent disruptions

---

[1]      The process and purpose of assigned seats is covered at length within the County's school bus rules as well as within the Transportation Department Policy of the Hamilton County Board of Education. In sum, the school bus driver is authorized under color of law to detain a disruptive student and restrict that student's ability to move freely by assigning the student to a seat near the front of the bus so that the student may be more closely supervised by the driver during the route.

~ 11 ~

f.     Students riding the bus "shall" be under the supervision of the driver/assistant at all times and "shall" obey the driver/assistant at all times.

g.     Bus drivers are expected to be familiar with the rules and regulations and supervisory staff are expected to enforce violations.

71.     The Transportation Policy provides that bus driver violations, such as "breaches of safety," may result in a disciplinary hearing, leading to suspension without pay or termination.

72.     Pursuant to the Transportation Policy, "[s]upervisory personnel are charged with the responsibility of seeing that all of these rules and regulations are followed." The supervisor designated by Durham is a person who acts as supervisory personnel on behalf of both Durham and HCDE. The Transportation Policy contains a section entitled "routes." This section requires each driver to "follow the specific route assignment without any deviations."

73.     The Transportation Policy also contains a section entitled "safety." This section proscribes that bus drivers "shall:"

a.     Obey all speed limits as follows:

i.     Rural streets not to exceed posted speed limit.

74.     In early November 2016, HCDE, Durham, and Coulter received written complaints from HCDE employees, parents and children that Durham employee and school bus driver Walker was recklessly endangering the safety of the young children on his route at Woodmore Elementary School.

75.     The written complaints included statements from elementary school children that:

The bus driver drives fast. It feels like the bus is going to flip over....He makes people go seat to seat back and forth, when someone is in the aisle he stops the bus and makes people hit their heads.

~ 12 ~

76.     Another written complaint that an elementary school student made to HCDE, Durham, and Coulter was a cry for help from those with the power and duty to keep her safe:

> The bus driver was doing sharp turns and he made me fly over to the next seat. We need seat belts.

77.     Woodmore Elementary School Principal Brenda Adamson-Cothran, after receiving the documented complaints of school employees and students about Walker's driving, notified HCDE, Coulter and Durham on several occasions that Walker was driving recklessly with students on board, injuring students intentionally and driving dangerously fast when leaving Woodmore Elementary.

78.     Neither Coulter, Durham nor HCDE took action to stop the dangerous behavior of Walker and continued to instruct the students to board the school bus each day with the actual knowledge that they were being placed in immediate danger.

79.     Moreover, despite HCDE and Durham's policy requiring the installation and use of an electronically monitored system to track both the path and speed of their school buses, and to monitor video-camera recordings from inside the school buses, Coulter, HCDE and Durham, by agreement, conspiracy and concerted action did not monitor or discipline Walker.

80.     Coulter, HCDE and Durham had actual prior knowledge that Walker was driving recklessly and that the students on his bus were being violently tossed about the bus. However, by agreement, conspiracy and concerted action, none of them took action to discipline Walker or protect the child.

81.     The Transportation Policy also contains a section entitled "student injury." This section explicitly instructs that, "[i]n the event a student is injured while on the school bus, it is the driver's responsibility to notify the supervisor immediately.

~ 13 ~

82.    Coulter, HCDE and Durham had actual prior knowledge that Walker's reckless driving had caused injury to the students on his bus which Walker had not reported.

83.    Consistent with the pattern and practice of HCDE and Durham, and the failure of Coulter to address the reported misconduct of Walker, neither HCDE, Durham or Coulter did anything to enforce the mutually established regulations which required Walker to immediately report the injuries sustained by students when they were violently thrown from seat to seat and were slammed into the seats in front of them – injuries caused by Walker's reckless and malicious driving.

84.    Coulter, HCDE and Durham had actual prior knowledge that Walker was using the school bus as a weapon to recklessly and maliciously inflict pain on the elementary school children riding his bus.

85.    Coulter, HCDE and Durham were charged with knowledge of the regulations, rules and policies that governed the transportation of the young children of Woodmore Elementary School.

86.    Coulter, HCDE and Durham instructed the young children to leave the safety of their elementary school and board the school bus operated by Walker throughout the month of November 2016.

87.    Coulter implicitly authorized, approved, and/or knowingly acquiesced to the unconstitutional behavior of Walker, and Durham, despite Principal Adamson-Cothran's reports. Durham implicitly authorized, approved, and/or knowingly acquiesced to the unconstitutional behavior of Walker.

88.    Among the rules and regulations that Durham and HCDE established, within Transportation Policy of the Hamilton County Board of Education there appears, under the

heading "second jobs," the following warning" It is "dangerous for bus drivers to work a complete shift and/or have less than six hours sleep prior to running a route."

89.     As early as November 2, 2016, a school official, Carlis Shackleford, documented his interaction with Walker after Mr. Shackleford boarded the bus in response to student complaints. Mr. Shackleford wrote:

> The driver was visibly upset and continued on by saying that he had another job and driving this bus was just a part time job for him.
>     ...
>
> Driver stated that he could just leave [a student] at the school. He then stated 'or I can just leave the student on the bus and I will get off the bus and leave the school.'
>     ...
>
> Driver stated that he did not care about the students and proceeded to tell the students he did not care about them.

90.     The HCDE and Durham had actual notice of these complaints inasmuch as Coulter, the Supervisor of Transportation for HCDE, responded to Mr. Shackleford's account with a perfunctory statement that "we are addressing the issue with the driver."

91.     Consistent with the pattern and practice of Coulter, HCDE and Durham, they did nothing to enforce their mutually established regulations regarding the danger of a school bus driver working a second job despite actual knowledge of Mr. Walker doing so, and were deliberately indifferent to the safety of the elementary school children on his bus.

92.     The Transportation Policy includes a section entitled "SAFETY," which imparts the clear instruction to bus drivers:

> STOP! CHECK YOUR BUS FOR SLEEPING CHILDREN BEFORE YOU EXIT YOUR MORNING RUN AND YOUR AFTERNOON RUN.

93.     Consistent with the pattern and practice of Coulter, HCDE and Durham, they did nothing to enforce their mutually established regulations regarding the known threat posed by

~ 15 ~

Walker leaving children on his bus, and were deliberately indifferent to the rights and safety of the elementary school children on his bus.

94. Pursuant to the mutually established rules and regulations of HCDE and Durham, the school principal, at the direction of Coulter and HCDE, is "responsible for the safe loading/unloading of buses while on their campus."

95. Pursuant to the mutually established rules and regulations of HCDE and Durham, the school principal "shall" report complaints from bus drivers regarding students within 24 hours, to preclude a problem from "getting worse." The Principal reported her observations, concerns, and complaints to Coulter.

96. Despite the mutually established rules and regulations of HCDE and Durham, Coulter, these three defendants ignored the complaints of the principal, driver, parents, and students and continued to direct the principal of Woodmore Elementary School to instruct her young students to leave the safety of the school campus and board a school bus operated by Walker, who was, by virtue of the mutually established regulations, rules, and policies, in charge of maintaining discipline on the bus.

97. Durham and Durham, despite their mutually established regulations, rules and policies, ignored Walker's repeated and flagrant violations of the same, thereby placing the child in imminent danger and subjecting him to repeated acts of physical and mental injury by Walker.

98. As a result of the aforementioned acts and omissions, HCDE subjected the elementary school children of Bus 366 to Walker's repeated and malicious infliction of bodily harm, including fear of death, to control the behavior of his passengers.

99. Durham subjected the elementary school children of Bus 366 to Walker's repeated and malicious use of bodily harm, including the fear of death, to control the behavior of

~ 16 ~

his passengers, by entrusting Bus 366, and its associated route to and from Woodmore Elementary School, to Walker every day, including November 21, 2016, and then requiring him to run that route.

100. Coulter, Durham and HCDE's approval of and deliberate indifference towards Walker's repeated and malicious use of bodily harm, including the fear of death, to control the behavior of elementary school children and their continuous instruction to the child and his classmates to board Walker's bus each day directly caused injury to the child and mental anguish to Lewis.

101. No reasonable school system, bus driver, transportation corporation, or employee and agent such as Coulter would have allowed the repeated and malicious use of bodily harm, including the fear of death, to control the behavior of elementary school children. No reasonable bus driver would have acted as Walker acted.

102. The force used by Walker coupled with the deliberate indifference of the other the Defendants, including slamming small children's heads into their seats, swerving the bus to make the children fall out of their seats and employing threats of death and imminent bodily harm, was grossly excessive and resulted in the child's serious injuries and mental anguish to Lewis. The child witnessed the infliction of death, severed limbs, and severe injuries to other occupants of Bus 366. The conduct of the Defendants shocks the conscious.

103. The force used by Walker coupled with the deliberate indifference of the other the Defendants, including slamming small children's heads into their seats, swerving the bus to make the children fall out of their seats, and employing threats of death and imminent bodily harm was malicious, and done for the sole purpose of causing harm.

~ 17 ~

104.    Upon information and belief, Walker was placed on Bus 366 by Durham and HCDE as punishment after being removed from another bus route in Hamilton County.

105.    Upon information and belief, Bus 366 was known to be a difficult route because of the large number of young children on the bus and the need for constant supervision and discipline by the bus driver.

106.    Walker submitted the names of more than 10 students who rode the bus whom he believed were not responding to his malicious methods of restoring discipline and requested that the other Defendants (i.e.: HCDE, Durham, and Coulter) place an assistant on the bus.

107.    The other Defendants not only ignored Walker's request, but Coulter, on behalf of HCDE and Durham, admonished Walker to stop referring so many students for discipline.

108.    By agreement, conspiracy and concerted action, the other Defendants ignored Walker's requests for assistance, ignored his malicious methods of discipline and his reckless and dangerous operation of the bus, and were deliberately indifferent to the abuse of child's Constitutional rights.

**The November 21, 2016 Bus Crash**

109.    On November 21, 2016, the other Defendants instructed the students, including the child, to board Walker's bus after afternoon dismissal. Prior to boarding Walker's bus, the children were otherwise in no imminent danger.

110.    Walker, with the agreement of Durham, HCDE, and Coulter, continued his malicious method of discipline on the school bus.

111.    As had become the custom, practice and policy of Durham and HCDE, despite actual prior knowledge that Walker was speeding and driving recklessly, no one was monitoring

~ 18 ~

the route or speed of Walker's bus. The bus was not on the mandatory route and Walker operated the bus in a willful, wanton, and reckless manner and at a high rate of speed.

112.    Upon information and belief, Walker, continuing in the discipline agreed to by Durham, HCDE, and Coulter, began to swerve violently in an attempt to inflict pain and fear upon child who was on his way home for Thanksgiving break.

113.    Upon information and belief, immediately prior to losing control of the bus, Walker yelled at the young children, "Are ya'll ready to die?"

114.    The bus swerved violently from the right side of the roadway to the left. It left the roadway at such a high rate of speed that the bus sheared a telephone pole at its base and slammed violently into a large tree.

115.    The impact severed the roof of the school bus, severely injured the child (child plaintiff) and decapitated another young child. Ultimately an additional five elementary school children died from their injuries. The child and several others were hospitalized for severe injuries while many other young children were treated at the emergency room for broken bones, lacerations and/or shock.

116.    First responders reported that the scene was horrific and within the wreckage very young children were covered in their own blood and the blood of their classmates and siblings.

117.    The child, also a passenger on Bus 366 at the time of the crash, suffered numerous and severe physical, emotional, and psychological injuries. He witnessed firsthand the deaths and injuries suffered by his fellow classmates.

118.    Plaintiff Lewis, experienced significant psychological trauma, and emotional trauma as a result of the November 21st crash and the child's resulting injuries.

~ 19 ~

119. The scene was so shocking that many of the first responders required treatment for emotional trauma after extricating the mangled bodies of children from the twisted wreckage.

120. The Plaintiffs endured atrocious and systematic treatment at the hands of the Defendants. That treatment culminated in death, dismemberment, severe physical injury and severe psychological trauma to many others, not just the Plaintiffs.

121. Only after the bus crash did HCDE, Durham and Coulter elect to (a) place a HCDE employee on all morning and afternoon bus routes at Woodmore Elementary and (b) establish a complaint management system that will purportedly monitor complaints of school bus driver misconduct. These measures illustrate the degree of control that HCDE, Durham and Coulter exercised prior to November 21, 2016. However, these modifications are temporary, have not been adopted into the Defendants' contract or rules and regulations, and do not have the force of law, and may be rescinded at any time.

**Count I**
**Violation of Civil Rights Under Color of Law – 42 U.S.C. § 1983**
**Breach of Duty to Protect Against State-Created Danger**

122. Plaintiffs incorporate and adopt each allegation contained in the preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

123. At all times relevant hereto, the child as an elementary school child, was in the Defendants' custody and under the Defendants' exclusive control while traveling on Bus 366 and a special relationship existed between the child and the Defendants.

124. At all times relevant hereto, Defendants acted under the color of law.

125. Defendants, under color of law, were expressly responsible for protecting the health, safety and welfare of the child from a danger created by the Defendants to which they then exposed the child. Defendants, in abrogation of this special duty, knowingly, recklessly and

~ 20 ~

callously exposed the child to callous punishment which was the direct and proximate cause of the child's grievous bodily harm and psychological trauma, and the mental anguish of Lewis.

126.    Defendants created the special danger to which they then exposed the Plaintiffs by their approval of, and agreement, conspiracy and concerted action to permit to continue, Walker's brand of "discipline."

127.    The Defendants affirmatively instructed the child to board Bus 366 each day despite actual prior notice that the children on the bus were being subjected to brutal physical and mental acts that had previously caused children on the bus injury and mental distress.

128.    Prior to being instructed and required to board Bus 366, the child was not in imminent danger.

129.    Defendants' actions placed the child in continuous and ongoing danger by instructing the child to board Bus 366 each day.

130.    Once the child boarded Bus 366 he was subjected to Walker's vicious physical and mental acts performed by Walker with the agreement and acquiescence of Defendants HCDE, Durham, and Coulter.

131.    The child faced special danger on Bus 366 because the sadistic acts were specifically targeted at and visited upon the occupants of the school bus, not the general public at large.

132.    The Defendants' actions and omissions placed the child in special danger of death and serious injury and his injuries were proximately caused as a result of the danger.

133.    The Defendants' actions and omissions created the special danger that the child would suffer death or serious physical injury as a result of Walker's actions.

~ 21 ~

134.     Because the Defendants' actions and omissions created the special danger to which the child was then required to be exposed, the Defendants had a duty to protect the child, and by extension, Lewis, and the Defendants failed to protect the child.

135.     Plaintiffs were further denied substantive due process of law as alleged *supra* and *infra*, and suffered the injuries complained of herein.

136.     Plaintiffs bring this claim as Count I against all Defendants in each of their respective capacities.

**Count II**
**Violation of Civil Rights Under Color of Law – 42 U.S.C. § 1983**
**Violation of Right to Bodily Integrity- U.S. Const. Amend. XIV**

137.     Plaintiffs incorporate and adopt by reference each allegation set forth in each preceding and subsequent paragraphs, as if fully restated herein.

138.     The Fourteenth Amendment to the U.S. Constitution protects Plaintiffs' rights to be free from physical abuse at the hands of state actors and the right to personal security and bodily integrity.

139.     Defendants HCDE, Durham, and Coulter violated the child's rights to personal security and bodily integrity when they countenanced and approved Walker's continuous use of malicious force on Bus 366, including driving recklessly and at high speeds, deliberately slamming on the brakes to force children into the seats in front of them, driving off of the approved route, and swerving on the road.

140.     Defendants HCDE, Durham, and Coulter were recklessly, callously, and deliberately indifferent to the child's Constitutional rights when they intentionally disregarded Walker's clear and persistent pattern of abuse of the students on Bus 366.

~ 22 ~

141.     Defendants HCDE, Durham, and Coulter, by agreement, conspiracy, and concerted action, tacitly approved Walker's unconstitutional conduct by failing to act, amounting to an official policy of inaction. Defendants HCDE, Durham, and Coulter had ample actual prior and constructive notice of Walker's continuing pattern of abuse and unconstitutional behavior.

142.     Defendants HCDE, and Durham's policy of inaction proximately caused the child's serious injuries and mental anguish and the mental anguish of Lewis.

143.     Defendant Coulter implicitly authorized, approved, and/or knowingly acquiesced to the unconstitutional behavior of Walker, and Durham. Defendant Durham implicitly authorized, approved, and/or knowingly acquiesced to the unconstitutional behavior of Walker. These acts proximately caused the child's serious injuries and mental anguish and the mental anguish of Lewis.

144.     The Defendants affirmatively instructed the child to board Bus 366 each day, including the afternoon of November 21, 2016, despite actual prior notice that the children on the bus were being subjected to cruel physical and mental acts. Those affirmative acts proximately caused the child's serious injuries and mental anguish and the mental anguish of Lewis.

145.     Each day, including the afternoon of November 21, 2016, Durham provided Walker with the keys to Bus 366, entrusted the bus and the route from Woodmore Elementary to him, and required him to run the route. These affirmative acts proximately caused the child's serious injuries and mental anguish and the mental anguish of Lewis.

146.     Defendants, as state actors, maliciously, intentionally, brutally, and inhumanely injured Plaintiffs, thereby abusing their official power and shocking the conscious.

147.     Defendants HCDE, Durham, and Coulter by agreement, conspiracy, and concerted action, provided inadequate training to and/or failed to train Walker regarding safe and

appropriate methods of school bus operation and student discipline, reporting and handling of safety complaints regarding school bus operators and the rights of school children to be free from sadistic punishment that causes death and severe physical injury.

148. Walker was too young to rent a car in Tennessee. He was inexperienced and, in addition to his previous traffic offenses, previously had caused a vehicle accident while driving a Durham school bus.

149. The Defendants HCDE, Durham, and Coulter by agreement, conspiracy, and concerted action, did not establish an adequate training system despite the fact that they had actual knowledge of Walkers' actions. Their inaction was by agreement, conspiracy, and concerted action, and with deliberate indifference to the ongoing violations of Plaintiffs' rights.

150. Plaintiffs bring this claim as Count II against all defendants in each of their respective capacities.

**Count III**
**Violation of Civil Rights Under Color of Law – 42 U.S.C. § 1983**
**Violation of Right to Family Integrity- U.S. Const. Amend. XIV**

151. Plaintiffs incorporate and adopt by reference each allegation set forth in each preceding and subsequent paragraphs, as if fully restated herein.

152. Prior to the events and claims averred in this Complaint, the Plaintiffs enjoyed a cohesive family that consisted of Lewis, Byrd, the child, and the child's two siblings.

153. The unconstitutional acts and omissions of the Defendants were the direct and proximate cause of the disruption of the family that resulted in travel to and from medical providers for the child in Tennessee and Georgia, and caused stress and upset to the family as a whole.

154.    Plaintiffs bring this claim as Count III against all Defendants in each of their respective capacities.

## Count IV
**Conspiracy to Deprive of Constitutional Right – 42 U.S.C. § 1985**

155.    Plaintiffs incorporate and adopt by reference each allegation set forth in each preceding and subsequent paragraphs, as if fully restated herein.

156.    As alleged, <u>supra</u>, the Defendants, acting under color of law, combined, conspired and confederated to violate Plaintiffs' Constitutional rights by the acts alleged herein. The Defendants' knowing, concerted, and malicious actions led to the deprivation of Plaintiffs' rights, as identified herein.

157.    Plaintiffs bring this claim as Count IV against all Defendants in each of their respective capacities.

## Count V
**Violation of Equal Rights**
**42 U.S.C. § 1981**

158.    Plaintiffs incorporate and adopt by reference each allegation set forth in each preceding and subsequent paragraphs, as if fully restated herein.

159.    The majority of the students on Bus 366 were African-American as were the Plaintiffs. The actions and omissions of the Defendants as set forth herein interfered with the Plaintiffs' ability to enjoy the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens.

160.    Violations of § 1981 are applicable to non-governmental actors and individual persons as well as governmental and corporate actors, and Plaintiffs sue the Defendants in their official and individual capacities and Durham in its corporate and governmental capacities and HCDE in its governmental capacity.

~ 25 ~

## Count VI
**Negligence and Gross Negligence**

161.    Plaintiffs incorporate and adopt by reference each allegation set forth in each preceding and subsequent paragraphs, as if fully restated herein.

162.    At all relevant times, Walker was an agent, servant, and/or employee of Durham, and Walker acted within the scope of that agency. Durham owed the highest degree of care to the children on Bus 366 as a Common Carrier and a governmental actor.

163.    At the time of the crash, Bus 366 was operated by Walker and registered with the State of Tennessee to Durham. Accordingly, and pursuant to TENN. CODE ANN. § 55-10-312, the vehicle was being operated for the use and benefit of Durham. Therefore, the negligence of Walker is imputed to Durham and Durham is liable for Plaintiffs' injuries and damages.

164.    Pursuant to TENN. CODE ANN. § 50-11-311, the bus was being operated by Walker with the authority, consent and knowledge of the owners and for the use and benefit of the owner. Therefore, the knowledge and negligence of Walker is imputed to Durham and Durham is liable for Plaintiffs' injuries and damages.

165.    At all relevant times, including during Bus 366's afternoon route on November 21, 2016, Walker was operating the bus in a negligent and careless fashion and caused  the crash which resulted in the child's and Lewis' injuries. Walker's actions breached the applicable duty of care as set forth within multiple Common Law Acts of Negligence, to-wit, Walker:

      a.    Was not driving the bus as an ordinary and prudent person would have done under the conditions and circumstances;

      b.    Was not keeping a proper lookout ahead in the direction in which the bus was traveling;

      c.    Was not exercising caution;

~ 26 ~

d. Failed to keep his vehicle under due and reasonable control;

e. Failed to devote full time and attention to the operation of a vehicle;

f. Failed to pay attention to the road;

g. Failed to drive on the right side of the road;

h. Failed to drive on the roadway;

i. Was operating the vehicle in excess of the posted speed limit;

j. Was operating the vehicle at a speed excessive for the conditions;

k. Was driving recklessly;

l. Failed to exercise the highest degree of care to protect the children aboard; and

m. Was otherwise negligent.

166. In addition to the Common Law Acts of Negligence described above, the Plaintiffs aver that Durham and Walker were at said time and place operating a motor vehicle in violation of certain traffic statutes of the State of Tennessee, then and there in full force and effect, to-wit:

a. TENN. CODE ANN. § 55-10-205 – Reckless driving;

b. TENN. CODE ANN. § 55-8-103  -   Obey traffic laws

c. TENN. CODE ANN. § 55-8-103 –Operator of vehicle owned or operated by any county, town district or political subdivision to comply with traffic laws;

d. TENN. CODE ANN. § 55-8-109 – Obey instructions of official traffic-control device;

~ 27 ~

e.  TENN. CODE ANN. § 55-8-115 & § 55-8-120 – Drive on right side of roadway;

f.  TENN. CODE ANN. § 55-8-136 – Drivers to exercise due care;

g.  TENN. CODE ANN. § 55-8-152 – Obey speed limit;

h.  TENN. CODE ANN. § 55-8-192 – Use of portable electronic device by school bus drivers;

i.  TENN. CODE ANN. § 55-8-197 – Driving on right side of roadway and failing to exercise due care resulting in an accident resulting in serious bodily injury or death;

j.  TENN. CODE ANN. § 55-10-106 – Immediate notice of accident;

k.  TENN. CODE ANN. § 55-10-101 – Accidents involving death or personal injury;

l.  TENN. CODE ANN. § 55-10-102 – Accidents involving damage to vehicle;

m.  TENN. CODE ANN. § 55-10-103 – Duty to give information and render aid; and

n.  TENN. CODE ANN. § 55-10-202 – Owner or any other person, employing or otherwise directing the driver of any vehicle to require or knowingly permit the operation of the vehicle in any manner contrary to law.

167.  In addition to the acts and omissions of Durham and Durham's agents, employees, servants, and contractors, Durham directly breached its duties to the Plaintiffs including, but not limited to, the following, with each and every one constituting a direct and proximate cause of the November 21, 2016 crash and Plaintiffs' injuries:

~ 28 ~

a.   Failure to have policies and procedures in place to ensure that all school bus drivers were properly hired, trained, supervised, investigated and disciplined;

b.   Failure to properly hire, train, supervise, investigate and discipline school bus drivers, including Walker; and

c.   Failure to use that degree of skill and care required of a student transportation company owing the highest degree of care under the circumstances then and there existing.

168.   Durham breached its duties to Plaintiffs maliciously, recklessly, and callously, exhibiting utter unconcern for the safety of the child, and a callous indifference to the welfare of the Plaintiffs.

169.   As a result of the November 21, 2016 crash, proximately caused by Durham's negligence and gross negligence, the child sustained personal injuries, including severe physical injuries and mental suffering; and the child has incurred and will incur considerable medical and other expenses as a result of the Durham's negligence; and the child has been deprived of the enjoyment of life. The child's injuries are permanent.

170.   As a result of the November 21, 2016 crash, proximately caused by Durham's negligence and gross negligence, Lewis sustained mental anguish.

171.   Plaintiffs bring this claim as Count VI against all Defendants in each of their respective capacities.

**Count VI**
**Assault and Battery**

172.   Plaintiffs incorporate and adopt by reference each allegation set forth in each preceding and subsequent paragraphs, as if fully restated herein.

~ 29 ~

173.     At all relevant times, Walker was an agent of Durham and HCDE.

174.     At all relevant times, Durham and HCDE owed the highest degree of care to the passengers on Bus 366.

175.     Durham, HCDE and Coulter had actual prior notice of and permitted, authorized, approved, and/or knowingly acquiesced to Walker's continued reckless driving and cruel treatment of the children on Bus 366, which was intended to, and did, place the child in imminent fear of bodily harm and death.

176.     Durham, HCDE and Coulter had actual prior notice of, and permitted, authorized, approved, and/or knowingly acquiesced to, Walker's reckless driving and cruel treatment of the children on Bus 366, which caused physical injury to the child on Bus 366. The child did not consent to these acts and, in fact, was not capable of consenting to such.

177.     Durham, HCDE and Coulter refused to take reasonable precautions to protect the child from the foreseeable risk that the child would continue to be battered and assaulted by Walker.

178.     Durham, HCDE and Coulter condoned Walker's reckless driving and cruel treatment of the children on the school bus, which caused both imminent fear of bodily injury or death and actual physical injury to the child and death to other occupants of Bus 366.

179.     Durham, HCDE, and Coulter are not immune from suit for the assault and battery committed by Walker inasmuch as neither tort is an enumerated intentional tort within the Tennessee Governmental Tort Liability Act, TENN. CODE ANN. § 29-20-205, et seq.

180.     Coulter's course of conduct violated multiple regulations, rules and policies regarding Walker's operation of the bus and was not a discretionary function.

~ 30 ~

181. Plaintiffs bring this claim as Count VII against all Defendants in each of their respective capacities.

## Count VIII
**Civil Conspiracy:**

182. Plaintiffs incorporate and adopt by reference each allegation set forth in each preceding and subsequent paragraphs, as if fully restated herein.

183. At all relevant times, Walker and Coulter acted in concert with Durham and HCDE.

184. At all relevant times, Durham and HCDE owed the highest degree of care to the passengers on Bus 366.

185. Durham, HCDE and Coulter had actual prior notice of and permitted, authorized, approved, and/or knowingly acquiesced to Walker's continued reckless driving and cruel treatment of the children on Bus 366, which was intended to, and did, place the child in imminent fear of bodily harm and death.

186. Durham, HCDE and Coulter had actual prior notice of, and permitted, authorized, approved, and/or knowingly acquiesced to, Walker's reckless driving and cruel treatment of the children on Bus 366, which caused physical injury to the child on Bus 366. The child did not consent to these acts and, in fact, was not capable of consenting to such.

187. Durham, HCDE and Coulter refused to take reasonable precautions to protect the child from the foreseeable risk that the child would continue to be battered and assaulted by Walker.

188. Durham, HCDE and Coulter condoned Walker's reckless driving and cruel treatment of the children on the school bus, which caused both imminent fear of bodily injury or death and actual physical injury to the child and death to other occupants of Bus 366.

~ 31 ~

189.     Durham, HCDE, and Coulter are not immune from suit for civil conspiracy inasmuch as civil conspiracy is not an enumerated intentional tort within the Tennessee Governmental Tort Liability Act, TENN. CODE ANN. § 29-20-205, et seq.

190.     Coulter's course of conduct violated multiple regulations, rules and policies regarding Walker's operation of the bus and was not a discretionary function.

191.     Plaintiffs bring this claim as Count VIII against all Defendants in each of their respective capacities.

WHEREFORE, the Plaintiffs demand judgment against the Defendants and request the following relief:

A.     The Court to enter judgment against all Defendants and to award Plaintiffs compensatory damages in the amount of TEN MILLION DOLLARS ($10,000,000);

B.     The Court to enter judgment against all individual Defendants and to award Plaintiffs punitive damages in the amount of TWENTY MILLION DOLLARS ($20,000,000);

C.     That the Court award attorney's fees;

D.     That the Court award costs, and discretionary costs;

E.     Any other relief the Court may deem fit and proper;

F.     Any other relief the Court may deem fit and proper pursuant to 42 U.S.C. § 1988, and

G.     Allow a jury trial on all issues.

Respectfully submitted,

\*\*\*Rule 11 signature and verification on next page\*\*\*

~ 32 ~



By: _____
    **ROBIN RUBEN FLORES**
    **TENN. BPR #20751**
    **GA. STATE BAR #200745**
    Attorney for Plaintiffs
    4110-A Brainerd Road
    Chattanooga, TN 37411
    (423) 267-1575
    robinflores@epbfi.com

**VERIFICATION**

STATE OF TENNESSEE    )
HAMILTON COUNTY    )

    I, Carl Lewis, first being duly sworn, do hereby make solemn oath that the facts contained in this Complaint as to paragraphs 12-32 are true to the best of my knowledge, information, and belief.

    This the _23_ day of _Feb_ , 2017.

                                 _Carl Lewis_
                                    **Carl Lewis**

SWORN TO BEFORE ME THIS _23_
DAY OF _Feb_ , 2017.

_____
Notary Public
My commission expires _____

~ 33 ~

## AGREEMENT FOR THE TRANSPORTATION OF PUPILS

THIS AGREEMENT FOR THE TRANSPORTATION OF PUPILS, hereinafter referred to as the "Agreement", is made and entered into this _____ day of _____, 2013, by and between HAMILTON COUNTY DEPARTMENT OF EDUCATION with a principal office located at 3074 Hickory Valley Road, Chattanooga, TN 37421 hereinafter referred to as "DISTRICT", and DURHAM SCHOOL SERVICES, L.P., a Delaware limited partnership, with its principal office located at 4300 Weaver Parkway, Warrenville, Illinois 60555, hereinafter referred to as "CONTRACTOR".

1. SCOPE OF AGREEMENT: CONTRACTOR shall operate and maintain one hundred and eighty-four (184) or more daily route school buses for the transportation of pupils using vehicles provided by CONTRACTOR.

   CONTRACTOR shall provide (a) the daily service for the DISTRICT, and (b) such other transportation as may be specified by the DISTRICT.

   a. The term "daily service", as used herein, is defined as all home-to-school and school-to home transportation of any students of the DISTRICT that takes place at the beginning or end of the school day for such students.
   b. The term "other transportation", as used herein, is defined as any transportation of students and DISTRICT personnel other than daily service, including but not limited to transportation to and from extracurricular events.

2. TERM: The term of this Agreement shall be for a period of four (4) years beginning July 1, 2013 and ending June 30, 2017. The Parties shall have the option to extend this agreement for an additional like term at the option and mutual written consent of the parties, taking into consideration CONTRACTOR'S performance under the Agreement, cost, fleet, negotiations, and subject to applicable statutes and regulations.

3. DOCUMENT AGREEMENT: The complete Agreement consists of this Agreement and the Proposal of CONTRACTOR, which is hereby incorporated herein by reference Bid File Number 13-15. In the event of any conflict between the terms of this Agreement and the Proposal, the terms of this Agreement shall govern.

4. PERMITS AND LICENSES: CONTRACTOR, its employees, and its agents shall secure and maintain valid permits, licenses, and certifications as required by law for the operation of this Agreement.

5. INSURANCE: CONTRACTOR shall obtain insurance in the amount of limits set forth below during the Agreement period and shall furnish certificates of insurance for each policy for liability coverage and for Workers' Compensation coverage. CONTRACTOR shall furnish new Certificates of Insurance for each policy for liability coverage and for Workers' Compensation coverage within thirty (30) days following the placement of new or renewed coverage. Certificates shall provide that a thirty (30) day prior notice of cancellation will be given to the DISTRICT.

   General liability insurance shall be maintained to protect CONTRACTOR and, as an Additional Insured, Hamilton County, Hamilton County Board of Education, Hamilton County Department of Education, its Governing Board, Officers, Agents, and Employees from any claims from damages for personal injury or death and from damage to property, which may arise from operations of

Page 1 of 10

EXHIBIT 4

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 34 of 44   PageID #: 38

CONTRACTOR under this Agreement. Such insurance shall have a minimum combined single limit of Five Million ($5,000,000) Dollars. Workers' Compensation insurance shall be maintained as required by law and to protect CONTRACTOR from claims, which may arise from its operation under this Agreement.

6. <u>PERFORMANCE BOND:</u> CONTRACTOR shall furnish to DISTRICT a Performance Bond equal to one hundred (100%) percent of the total value of the Agreement.

7. <u>HOLD HARMLESS AGREEMENT:</u> CONTRACTOR shall hold harmless and fully indemnify Hamilton County Board of Education, Hamilton County Department of Education, and/or its Officers, Agents, and Employees from every claim or demand which may be made by reason of any injury to person or damage to property sustained by any person, firm or corporation, caused by, in whole or in part, or arising out of or related to, any negligent act or omission, willful misconduct, or default of the CONTRACTOR or of any person, firm, or corporation, directly or indirectly employed by CONTRACTOR, in connection with its performance under the Agreement and irrespective of any allegation of fault against Hamilton County Board of Education, Hamilton County Department of Education, and/or its Officers, Agents, and Employees .

CONTRACTOR at its own expense and risk shall defend any legal proceeding that may be brought against the Hamilton County Board of Education, Hamilton County Department of Education, and/or its Officers, Agents, and Employees on any such claim or demand, and satisfy any judgment that may be rendered against the Hamilton County Board of Education, Hamilton County Department of Education, and/or its Officers, Agents, and Employees therein. In the event that any such proceeding is brought against the Hamilton County Board of Education, Hamilton County Department of Education, and/or its Officers, Agents, and Employees on any such claim or demand, CONTRACTOR shall have the right to select and employ counsel to defend such persons and entities and shall have the right to settle any claims when CONTRACTOR, in its sole discretion, deems such a settlement advisable. Hamilton County Board of Education, Hamilton County Department of Education, and/or its Officers, Agents, and Employees shall cooperate in all reasonable manners in the defense of such claims. Further, CONTRACTOR shall endeavor to secure a dismissal of any such proceeding against Hamilton County Board of Education, Hamilton County Department of Education, and/or its Officers, Agents, and Employees promptly upon receipt of any such claim or demand and shall substitute CONTRACTOR as a party defendant.

8. <u>SAFETY PROGRAM AND EDUCATION:</u> CONTRACTOR shall provide formal safety instruction on a regular basis for all operating personnel assigned to this Agreement. Attendance shall be required for safety meetings.

Upon DISTRICT'S request CONTRACTOR will provide documentation of CONTRACTOR'S formalized recruitment in-service training and educational programs for all employees, including staff, drivers and mechanics.

CONTRACTOR shall provide evidence of resources available for research and development needed to stay current with the changing technologies in student transportation management.

CONTRACTOR will provide evidence of all aspects of their technical transportation management capabilities, including human resource services, computer systems and capabilities, and training programs for management and non-management personnel.

9. <u>INDEPENDENT CONTRACTOR:</u> While engaged in carrying out and complying with the terms and conditions of this Agreement, CONTRACTOR is an independent CONTRACTOR, and not an Officer, Agent, or Employee of the DISTRICT. Furthermore, CONTRACTOR'S officers, agents and employees shall be the officers, agents and employees of the CONTRACTOR and not of the DISTRICT.

10. <u>ASSIGNMENTS:</u> Upon reasonable notice to the DISTRICT, and upon the DISTRICT'S approval, CONTRACTOR may assign or transfer any of its rights, burdens, duties, or obligations under this Contract to its parent company,

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 35 of 44   PageID #: 39

affiliates, subsidiaries, or related legal entities. The DISTRICT'S approval shall not be unreasonably withheld.

11. SUBCONTRACTING: CONTRACTOR will not subcontract any of its rights, burdens, duties, or obligations under this Agreement without consent of the DISTRICT, except on a short term, interim basis in the event of an emergency.

12. FORCE MAJEURE: CONTRACTOR shall be excused from performance hereunder during the time and to the extent that it is prevented from performing in the customary manner by an act of God, fire, flood, war, riot, civil disturbance, terrorism, epidemic, quarantine, oil or fuel shortage or commandeering of equipment, materials, products, plants, or facilities by the U.S. Government when satisfactory evidence thereof is presented to the DISTRICT; provided, however, CONTRACTOR shall use all reasonable efforts to ensure that none of DISTRICT'S routes shall suffer any route interruption.

In the event DISTRICT closes one or more schools prior to routes beginning on any day or days, DISTRICT shall have no obligation to pay CONTRACTOR for any bus routes that are not run.

13. ROUTING AND SCHEDULING: Prior to the start of any service under this Agreement, CONTRACTOR shall cooperatively assist DISTRICT in establishing routes and schedules conforming to the needs of the DISTRICT. If, at any time during the term of the Agreement, it is determined by mutual consent that service may be improved by revisions to routing, scheduling, or bus assignment, DISTRICT and CONTRACTOR shall plan and institute such changes jointly. CONTRACTOR shall have sufficient notice to review such changes and evaluate the safety considerations.

DISTRICT and CONTRACTOR agree that any program outlined in the Proposal is to be considered only as the basis for determining comparative costs and does not necessarily represent the routing, scheduling, or equipment requirements of the DISTRICT.

The CONTRACTOR agrees to assist in routing of all regular, magnet and special education buses, and to assist in analyzing and to identify routes for restructuring to create efficiencies. The routing will be accomplished with the cooperation of the Transportation Staff and shall be ready for DISTRICT approval and owner/operator review by June 10 of each school year. The DISTRICT will cooperate with the CONTRACTOR by approving the routes or suggesting needed changes in a reasonable and timely manner. However, the CONTRACTOR and DISTRICT may agree to alter, modify, or amend the bus routes and/or stops along the way, to change or add bus routes, establish new bus routes and change time schedules for pick-ups and deliveries in order to meet changing conditions. Rules and regulations for details incidental to the operation of bus routes, bus stops and other attendant matters that may arise shall be mutually agreed upon. The DISTRICT will place Special Education students on a route and CONTRACTOR will begin service to these students within three (3) days of written notice of this placement by the DISTRICT.

14. CONTRACTOR'S PERSONNEL: CONTRACTOR shall be solely responsible for hiring sufficient personnel to perform CONTRACTOR duties under this Agreement, provided however, in no event shall CONTRACTOR employ fewer personnel than the CONTRACTOR purposed in its PROPOSAL. Such personnel shall be CONTRACTOR employees and, in no event, shall be the employees of the DISTRICT. CONTRACTOR shall be solely responsible for providing such personnel with appropriate supervision, training, and direction in the performance of personnel job duties.

In the event the DISTRICT has any questions or concerns regarding the performance or any personnel employed by the CONTRACTOR, the CONTRACTOR may take whatever action it deems necessary and appropriate to address the DISTRICT concern.

Prior to employing any individual in any capacity for the purpose of providing service to the DISTRICT

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 36 of 44   PageID #: 40

under the terms of this Agreement, the CONTRACTOR will screen each applicant, this screening to include pre-employment drug testing, criminal background checks, and any other tests, or checks required by state or federal law for individuals. In addition to these pre-employment screens, CONTRACTOR will additionally perform regular random drug tests required by state and federal laws and will additionally perform random background checks on no less than five percent of its employees per year. The CONTRACTOR shall make available to the DISTRICT the results of all screenings, including drug tests and background checks.

CONTRACTOR shall designate one (1) person as its local representative to act as the supervisor for the operations for the DISTRICT. This person shall be available during all regular working hours of school days for the purpose of handling routing, assignments, and operational concerns. The supervisor shall have the authority to act in all matters covered by established policies.

15. RECORD KEEPING AND ACCIDENT REPORTS: CONTRACTOR will be required to keep and maintain any and all operational records related to its performance under the terms of this Agreement and will provide such records to the District for its inspection.

All accidents, injuries, and other like incidents involving the CONTRACTOR'S equipment, CONTRACTOR'S personnel, or the DISTRICT students shall be reported to the DISTRICT on approved forms pursuant to Board policy and the laws of the State of Tennessee.

16. PAYMENTS FOR SERVICES:

    a    Daily Services: CONTRACTOR shall submit in 10 equal invoices beginning on or about the last business day of September and monthly thereafter and invoice for all daily services performed under this Agreement.. The starting number of vehicles for this calculation is 184 buses and the starting number of operating days will be according to the Hamilton County Department of Education approved calendar. In the event there is a change in the number of buses or the number of operating days, there will be an adjustment on the 10th payment. Any DISTRICT credits will be credited on the 10th payment as well.

            Daily Service rates are charges not assessed on a set number of days but on and per bus per day actually operated daily rate.

    b.    Other Transportation Services: On or about the last business day of each month beginning in July, the CONTRACTOR shall submit invoices in the form and number required by the DISTRICT for other transportation services performed under this Agreement. Payment for such services will be made within a reasonable time thereafter, not to exceed thirty (30) working days. In the event such sums are not received within ninety (90) days, service may be discontinued until such time as the CONTRACTOR has received all sums due.

17. ADJUSTMENT OF RATES:

The rates established in all pricing schedules for this Agreement after the first year of the contract shall be increased 1.8% annually.

If the average daily number of routes is reduced by five percent (5%) or more below the base amount of 184 routes, then both parties agree to renegotiate in good faith the rates provided in Schedule A if such renegotiation is requested by Contractor.

During the term of this Agreement, if the CONTRACTOR's implementation of the Patient Protection and Affordable Care Act increases the CONTRACTOR's insurance costs on personnel retained specifically to provide services to the DISTRICT by more than two hundred thousand

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 37 of 44   PageID #: 41

dollars ($200,000.00) per year, then CONTRACTOR, upon written notice to DISTRICT, may request a renegotiation of this Agreement which shall be conducted in good faith. Such renegotiations may include, without limitation, changes in rates, term, payment schedules, levels of service, and the types or number of vehicles to be used. Any modification to this Agreement resulting from such renegotiations shall become effective on a mutually agreed upon date. If no agreement is reached, CONTRACTOR may terminate this Agreement at any time by providing at least two hundred and seventy (270) days written notice to DISTRICT.

The number of vehicles for this calculation is 184 buses. In the event the service requires fewer daily buses than the established base of 184, then the CONTRACTOR shall credit its charges by the applicable daily per bus per day rate in a separate credit invoice for the appropriate number of days. If the service requires more daily buses than the established base of 184, then the CONTRACTOR shall increase its charges by the applicable daily per bus per day rate in a separate invoice for the appropriate number of days. The DISTRICT shall make the final determination for adding or reducing the number of buses or routes. The CONTRACTOR will assist in evaluating all routes as an on-going program to initiate recommendations to the DISTRICT to affect cost savings.

18. **EQUIPMENT REQUIREMENTS:** All buses supplied under this Agreement shall be approved school buses, as defined by applicable statutory, administrative codes and DISTRICT requirement/specs, with the approval of the DISTRICT.

CONTRACTOR agrees that no existing bus will be over the age of seven (7) years at the start of the Agreement. The fleet to be contracted for shall consist of 63 type A wheel chair, C.E. White seats SS-CR 36, and air conditioning equipped special needs buses. The regular route bus fleet of 121 types D of the 121 daily regular route buses in the first year of the Agreement will be 114 - 84 passenger and 13 - 78 passenger in size with no single bus smaller than a 78 passenger in size. Starting in year two of the Agreement all regular route buses will be 84 passenger in size.

The CONTRACTOR shall furnish buses to facilitate the operation of the Innovation Zone program. This program will utilize approximately 6 type D 84 passenger buses and 6 type A 22 passenger buses in the afternoon only. This program may have days outside of the 175 calendar. This program may be expanded.

The CONTRACTOR shall provide fourteen (14) new 84 passenger buses each year of the Agreement starting with the first year of the Agreement.

The CONTRACTOR will provide a minimum of twelve (12%) percent spare buses of each type serving the DISTRICT, such buses to conform to all specifications contained here within. The CONTRACTOR shall own and provide on their buses the 800 MHZ SmartZone two-way radios with identifiers that are in working condition and installed according to manufacturer's specifications. Spare buses shall be of appropriate size, and meet all the above requirements and shall be located by the CONTRACTOR at points close enough to the DISTRICT so they may be substituted for regularly assigned buses, if needed, without delay.

The CONTRACTOR will provide the Smart Bus technology and components on its buses.

The CONTRACTOR will equip all buses with GPS technology that enables support staff to monitor the path and speed of a bus. District staff will be given access to this system. Regular preventive maintenance shall be performed on all buses. In addition, buses shall be cleaned inside and out as

necessary, and repairs to visible body damage, inside or out, shall be made within thirty (30) days from the date such damage occurs.

The CONTRACTOR shall only use buses which shall meet state inspection standards and specs for the DISTRICT. The CONTRACTOR shall be responsible for all repairs and maintenance on all buses during the life of this Agreement. The CONTRACTOR shall maintain all vehicles as to insure that each vehicle under service to this contract is washed a minimum of twice per month and is in clean and sanitary condition. The CONTRACTOR shall at all times provide for maintenance of owned fleet and procurement of replacement of buses.

The CONTRACTOR shall not fuel any vehicle while students are on board the vehicle. The CONTRACTOR shall provide student and mileage information in order to assist the DISTRICT in complying with applicable regulations. In addition, the CONTRACTOR will provide reasonable assistance to the DISTRICT to assist it in completing and filing necessary reports to governmental bodies.

During the course of the contract, the CONTRACTOR shall install and maintain mounted and active digital camera systems with ignition-activated dual infrared cameras in all of the CONTRACTOR buses to be used in the service of this contract. The CONTRACTOR shall, at minimum, randomly view route digital recordings on a daily basis of an amount of 5% of total daily routes in service for this contract with each vehicle to be viewed at least once within each thirty (30) service days. Digital recordings shall not be viewed or distributed to NON-DISTRICT personnel without prior written approval by the Superintendent of Schools or his designee. All digital recordings shall be maintained for at least thirty days for DISTRICT viewing purposes. The CONTRACTOR shall maintain all radios and cameras so that they are operational at all times; the CONTRACTOR is expected to establish a replacement cycle for this equipment, which will be purchased by the CONTRACTOR. Any persons who destroy, alter, or vandalize the radio or digital recording systems are subject to prosecution/suspension or both.

19. <u>USES AND MAINTENANCE OF FACILITY:</u> CONTRACTOR may have access to and utilize the District's existing transportation facilities pursuant to a separately executed Lease Agreement referenced as Exhibit I, the entirety of which is incorporated into this Agreement by reference.

20. <u>FUEL:</u> Fuel shall be paid for and provided by CONTRACTOR. The CONTRACTOR shall be responsible for all taxes on fuel used and fuel storage. The CONTRACTOR shall pay for all fuel used in regular, charter, activity and athletic trips. Fuel storage will not be allowed on DISTRICT property.

The Contractor shall be responsible for providing the fuel required during the performance of this Agreement. The Contractor shall be responsible for all taxes on fuel used. The Contractor shall pay for all fuel used in regular, charter, activity and athletic trips. The Contractors compensation for services rendered hereunder shall be adjusted monthly to reflect increases or decreases in the District's wholesale cost of fuel plus transportation fees and state taxes. The contract "Base Fuel Cost $3.063 per gallon" encompassing all fuel costs shall be based on U.S. Department of Energy Information spot prices for Ultra Low Sulfur Diesel for the Gulf Coast per gallon each month during the contract period. Should the average cost per gallon differ from the "Base Fuel Cost" by more than $.10 cents per gallon plus or minus, the contractor shall adjust to reflect the actual cost of fuel by providing a credit or invoicing for the change in cost. The amount to be either credited or invoiced for shall be based on an average of 6.5 miles per gallon and based on the loaded route miles as established each year by the Hamilton County Schools Transportation Department. The contractor will be required to provide fuel storage. CONTRACTOR shall have the right to wet hose fuel.

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 40 of 44   PageID #: 44

21.  TERMINATION OF AGREEMENT: If the CONTRACTOR refuses or fails to perform services
necessary to providing the DISTRICT with efficient, safe and economical transportation services, as
specified in this Agreement, or any separable part thereof, including furnishing adequate equipment and
properly trained personnel, or if it should be adjudged as bankrupt, or if it should make general assignment
for the benefit of creditors, or if a receiver should be appointed on account of its insolvency or should it
refuse or fail to provide equipment and personnel in quantities necessary for transportation services as
herein specified, or the CONTRACTOR disregards laws, ordinances, or instructions of the DISTRICT, or is
otherwise guilty of a material violation of this Agreement, then the DISTRICT may, without prejudice to
any other right or remedy, serve written notification upon the CONTRACTOR of the violation, its intention
to terminate and, unless within forty-five (45) days after service of such written notice of the condition, the
CONTRACTOR shall cease and make satisfactory arrangements for the correction thereof, this Agreement
shall, upon the expiration of the forty-five (45) days, cease and terminate.

22.  NOTICES: Notices to either party to this Agreement shall be in writing and shall be considered duly served
and delivered if such notice is delivered by hand, mailed via the United States mail, certified, return receipt
requested, or sent via overnight service. All such notices shall be addressed to:

DISTRICT:          Hamilton County Department of Education.
                   3074 Hickory Valley Road
                   Chattanooga, TN 37421
                   Telephone: (423) 209-5680

CONTRACTOR:        Durham School Services, L.P.
                   Attn: Contract
                   Administrator
                   4300 Weaver Parkway
                   Warrenville, IL 60555
                   Telephone: (630) 821-5400

23.  DISCIPLINE: The CONTRACTOR will report serious or persistent misconduct on the part of students to
the designated DISTRICT employee. The DISTRICT shall then impose reasonable disciplinary measures
upon the students in accordance with its discipline management program.

24.  CREDITS FOR NON-PERFORMANCE: The CONTRACTOR agrees to submit a written status report on
a daily basis by bus number, school, driver's name and dispatch location listing any of the following
deficiencies in its performance and the causes thereof.. After the first 20 school days the DISTRICT shall
provide written notice to the CONTRACTOR of any of the following deficiencies reported to the
DISTRICT.  If CONTRACTOR fails to cure the items within three (3) school days of the written notice,
or fails to appeal any assessed credit within ten school days the following credits shall, per incident, be
applied against the monthly invoice:

(1) Late bus a.m. and/or p.m.: $150.00 per incident per bus.
(2) Number of students riding bus exceeds safe capacity per manufacturer's specifications:
$150.00 per day per bus.
(3) Failure to pick up or deliver a student with disabilities will result in a $150.00 penalty per
incident.
(4) A bus which is late because of a need to refuel, or because it runs out of fuel en route:
$150.00 per incident.

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 41 of 44   PageID #: 45

(5) Early departure of a bus from a scheduled stop: $100.00 per incident.

(6) Driver misses a stop on a route or fails to pick up student: $100.00 per incident.

Credits will be assessed at the rate of $100.00 per incident for each of the following violations:

(7) Failure of a driver to keep an up-to-date route sheet on board and on file with CONTRACTOR: $100.00 per day.

(8) Seat belts and other special equipment not used or improperly being used.

(9) Bus without a two-way radio as required or a two-way radio not in proper working condition for any reason for three (3) working days.

(10) Failure by dispatcher to immediately notify the DISTRICT of an accident.

(11) Failure to clean a bus interior and exterior after two days' notice.

(12) Improper usage of cell phone in the operation of a school bus as defined by TCA (Tennessee Code Annotated)

(13) Failure to stop and use proper procedures at a railroad crossing as defined by TCA (Tennessee Code Annotated)

In addition to the above, credits will also be assessed as set forth for each of the following violations of this contract with no prior notice to the CONTRACTOR:

(14) $150.00 shall be assessed for each morning trip missed (trips starting in the a.m.)

(15) $150.00 shall be assessed for each afternoon trip missed (trips starting in the p.m.)

(16) School possesses documentation, which indicates confirmation of a field trip was received but no bus(es) arrived. Students were unable to attend the event. $150.00 per day per bus.

There shall be no credit assessments made to the CONTRACTOR until after the first twenty (20) school days of each school year. Before DISTRICT applies any credit, DISTRICT shall provide written notice to the CONTRACTOR, which will include the date the deficiency occurred, and the amount of credit. DISTRICT must provide such notice to CONTRACTOR within thirty (30) days of any occurrence giving rise to a claimed deficiency. DISTRICT waives its right to assess credits for non-performance for any occurrence in which notice was not timely provided to CONTRACTOR. CONTRACTOR reserves the right to appeal any assessed credit within ten (10) school days of written notification from DISTRICT to the Superintendent or his designee. Credit for any assessed violations in dispute shall not be applied until the Superintendent or his designee resolves the appeal.

25. DISPUTE RESOLUTION: The parties agree this Agreement shall be governed by the laws of the State of Tennessee and that the state courts of Hamilton County, Tennessee will have sole and exclusive subject matter jurisdiction over any dispute arising between the parties. The parties specifically waive any right to file any action in federal court or to remove any matter to federal court.

26. ATTORNEY'S FEES: If any legal action is brought by either of the parties hereto, it is expressly agreed that the party in whose favor final judgment shall be entered shall be entitled to recover from the other party reasonable attorney's fees in addition to any other relief that may be awarded.

27. DAILY SERVICES: In Consideration of the performance on the part of the CONTRACTOR of the terms of this Agreement, the DISTRICT agrees to pay the CONTRACTOR for daily services the following sums for pupil transportation services rendered.

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 42 of 44   PageID #: 46

| Rates | | | 2013-2014 | 2014-2015 | 2015-2016 | 2016-2017 |
|---|---|---|---|---|---|---|
| Vehicle Type | Number of Vehicles | Number of Days Per Year | Cost Per Bus Per Day | Cost Per Bus Per Day | Cost Per Bus Per Day | Cost Per Bus Per Day |
| **Regular Transportation** | | | | | | |
| 84 Passenger Type D | 127 | 175 | 300.98 | 306.40 | 311.92 | 317.53 |
| **Special Education Transportation** | | | | | | |
| 22 Passenger (Wheelchair units) | 63 | 175 | 300.98 | 306.40 | 311.92 | 317.53 |
| Bus Aides | 63 | 175 | 89.29 | 90.90 | 92.54 | 94.21 |
| **Misc. Transportation Programs** | | | | | | |
| Summer School | 46 | 26 | 159.35 | 162.22 | 165.14 | 168.11 |
| Saturday School | 9 | 9 | 62.68 | 63.81 | 64.96 | 66.13 |
| After School | 6 | 100 | 62.68 | 63.81 | 64.96 | 66.13 |
| Noon Day | 4 | 175 | 62.68 | 63.81 | 64.96 | 66.13 |
| I-Zone Transportation | 13 | 180 | 173.21 | 176.33 | 179.50 | 182.73 |

| Sports/Activity Trips | Cost Per Mile | - |
|---|---|---|
| | Cost per Hour | 42.27 |
| | Minimum Per Trip | 126.80 |

| Grand Total (excluding trips) | | 11,674,462.33 |
|---|---|---|

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 43 of 44   PageID #: 47

For Sports and activity trips the yearly increase after the first year of the Agreement is 1.8%.

OPTIONAL SERVICES: In Consideration of the performance on the part of the CONTRACTOR of the terms of this Agreement, the DISTRICT and CONTRACTOR agree that optional services will be contracted on an 'as needed basis'. It is further agreed that optional services are not a part of the daily services (home to school/school to home).

28. GUARANTEED CUSTOMER SATISFACTION:
CONTRACTOR will strive for consistent communication with DISTRICT throughout the entire contract period. CONTRACTOR will annually survey the DISTRICT and the employees and use the results to continually improve the service and hold an annual meeting with the DISTRICT advisory panel to hear feedback. CONTRACTOR will institute a weekly meeting between the DISTRICT Administrators and CONTRACTOR'S general manager for the first six months of the contract, with a monthly meeting after the first six months, to evaluate service, safety, maintenance, and overall satisfaction.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date written above.

DURHAM SCHOOL SERVICES, L.P.

By: Durham Holding II, L.L.C.,
its general partner

By: _____

Name: GP Singh

Title: SVP Commercial Develop

Date: 4/24/13

HAMILTON COUNTY DEPARTMENT OF EDUCATION

By: _____

Name: Rick Smith

Title: Superintendent

Date: April 30, 2013

Case 1:17-cv-00072-JRG-SKL   Document 1-1   Filed 03/14/17   Page 44 of 44   PageID #: 48